Do you want me to control things from this end? Yes, why don't you do that? Okay. The way I understand that the argument has been structured is that counsel for Mr. Flatow will argue his 10 minutes first, and then MOD will respond to that, and there will be a rebuttal if there is any by Mr. Flatow. And then we will go to Mr. Elahi's case following that. So you'll watch the clocks, and we'll start with the Flatow case first. Good afternoon. For the record, I'd like to take eight minutes and reserve two minutes for Elahi. Okay, watch your own clock there. Thank you. Do speak up, too, because it will be hard for Judge Wardlaw to hear you. And state your name for the record also. Thank you, Your Honor. My name is Stephen Robert Perlis. I am counsel for the family of Lisa Flatow, who was killed in an Iranian-sponsored terrorist attack in greater Israel. At issue today, I presume, is the question of the Flatow family's relinquishment as the other consolidated matter, that is, the one dealing with the intervention questions was previously argued before the case was set down. And I'm going to limit my comments today to that question. The government of Iran argues that Mr. Flatow has relinquished his right to a judgment lien against the judgment which they have obtained enforcing an arbitration award against cubic defense systems. I think it's important that we look at the structure of where the different pieces of this activity are because it will help elucidate why there has been no relinquishment here. Mr. Flatow holds a judgment lien in the Southern District of California, which is at issue here. He also holds a garnishment in the Eastern District of Virginia. The garnishment in the Eastern District of Virginia is against cubic. It's for the payment of the funds. The judgment lien here liens the judgment itself, not the payment. Iran argues in some amorphous way that everything is regulated, and we take exception to that. To start with, a regulated activity under IEPA requires a license. It is, in fact, a complex licensing mechanism. If a terrorist state like Iran wishes to engage in a financial transaction in the United States, that activity requires a license that it or its corresponding U.S. entity in the transaction must obtain. It is undisputed here that neither Iran nor cubic has applied to the Treasury for a license. They foreshadow this cannot be a regulated activity. Iran has an absolute and unqualified right under the New York Convention on the Enforcement of International Arbitral Awards to enforce their, as a signatory to that convention, to enforce that award in the United States. It has done that. That is an unregulated activity. Below, in proceedings before Judge Brewster, Iran argued that perhaps cubic needed a license. But cubic has not applied for a license. It has also obtained a supersedious bond in this case. That bond, like, is in the ordinary form for a bond in this circuit. It pays 10 days after cubic should default on payment when this matter becomes final. If this is a regulated matter, that bond is per se an unlawful financial transaction. It is void in ab initio, and the making of that bond is a felony under HIEPA. Now, I would suggest to the Court that cubic didn't go out and commit a felony. It went out and obtained a bond in the ordinary course because it understood that the matter was not regulated. Because it's not regulated, there was no relinquishment by Mr. Flato. So your argument is that it's not property subject to regulation? That is correct. You say it's not under 1610F1A. Is that what you're saying? That's correct. The question is whether Mr. Flato, in consideration for accepting $26 million in blocked Iranian assets by act of Congress, relinquished his right to attach this kind of activity to enforce the balance of his judgment. And we are arguing that it is not part of the description of what a regulated activity is under 1610. The best evidence of that is no one has a license, and those are the licensing mechanisms. Now, Congress ---- If we were to agree to that extent, but say that there should have been a license, therefore it should be regulated, where does that take us? Well, if there should have been a license, I think you have to ask at what point should a license have issued, because that is a — that may well be a dispositive question here. If there is a license that is required, it's not Iran's license. They have an absolute and qualified right under the New York Convention to bring this proceeding. If a license is required, it would be of Cubic. It would be on the other end. But that would call into question the vitality of the garnishment that we've lodged against Cubic in the Eastern District of Virginia, because that would be the regulated activity. It would be the payment. But the proceeding we have before us, what was heard before Judge Brewster, expressly excluded activities in the Eastern District. Judge Brewster properly pointed out in that proceeding he has no jurisdiction to comment on proceedings in the Eastern District of Virginia. The question is whether the judgment lien, that is, a lien against this unregulated activity, requires a license. Iran doesn't have one. Iran is not required to get one. What would happen under that scenario is Mr. Flato's judgment lien would be considered valid because no license is required for Iran to obtain the judgment. At that point, Mr. Flato stands in Iran's shoes. The activity that Cubic should have gotten a license for, that is, the making of this bond and the payment, no longer becomes a regulated transaction because Mr. Flato becomes the party in interest to the judgment itself. The bond would then pay to Mr. Flato. The unlawful making of the bond really becomes a prior technical violation of the  Let me ask just a factual question. The Cubic M.O.D. case is still on appeal to this Court? That is correct. It's still under mediation? I don't know, because both Cubic and Iran refused to allow or refused to go to mediation if Mr. Flato participated. I believe we took this very issue up when we were discussing the unusual circumstances of this case and the appropriateness of intervention. And had we been entitled to intervention, we would have been allowed to participate in the mediation. So I can't comment on that. I apologize, Your Honor. Is the garnishment order in the record? Yes, it is, Your Honor. And I'd be pleased to furnish it. Is it part of the excerpt of the record? It should be part of the record. That matter, of course, involves Cubic, Iran, and Mr. Flato. We have a copy of it. Judge Brewster has a copy of it. You know, I'm not privy to what's transmitted from the district court, but it is on file. It should be part of the record. If it's not, I'd be pleased to tender a copy to the Court this afternoon when I'm leaving. We theoretically have the full record. It should be in there. All right. Do you want to save the rest of your time? I'll save the balance. Thank you, Your Honor. All right. You may. Mr. Van Patten. Your Honor, I'm Anthony Van Patten for the Ministry of Justice. Excuse me, could we accept that for 10 minutes? Hold on a minute. Let's get the clock set right. Well, it won't take 10 minutes. To the extent that I understand Mr. Perlis's argument, and I must confess I don't, I think it's answered in our papers. Can you please speak up a bit? I believe it's answered in our papers, and I won't take up any more time now. I would point out, however, that the licensing doesn't seem to be relevant to this. The point is that all property of Iran is subject to the OFAC regulations, all property and all transactions. And I don't know, the asset is just property. I mean the judgment is just property, and it's subject to control whether or not we have a license. We don't have a license because there's no reason to have a license. So what is the effect of either the lien in the Southern District of California or the garnishment order in the Eastern District of Virginia on that property? I'm sorry, Your Honor, I didn't understand. What is the legal effect of the Eastern District of Virginia garnishment order and the judgment lien here on the nature of your ownership interest in the property? Well, the issue is that we've actually gotten a judgment against Cubic. So if we're able to get the money for that judgment, then it would be subject to the liens, Mr. Elahi's liens and Mr. Plato's liens, if they were approved. So including for Mr. Plato the garnishment order? I believe so. We've not been involved in the garnishment order. That's been handled back east. Well, I'm just trying to figure, related to one of the arguments that Mr. Plato elected to take the 10 percent, I mean the 100 percent and left behind 10 percent on the table of compensatory damages, will he nevertheless get anything under that garnishment order? Well, as I understand the plain language, that he relinquished all rights to claims against Iran except for the punitive claims, which under the regulations can only be at this point can only be asserted outside the United States. Is it your position that this judgment is in effect blocked assets? Well, all Iranian assets are blocked. It's an asset of Iran and all Iranian assets are blocked. And so far as I know, the New York Convention totally has nothing to do with it, I mean so far as I've been able to determine. When you say they're all blocked, how are you defining blocked? Is there some official step that has to be taken to make them blocked? Well, we have to get a license. Assuming we get the money from this cubic judgment, then we have to apply for a license to send it back to Iran. And historically, what does that block stand for? Does that stem from when the Shah left Iran and there was the revolution there? Is that when all the assets of Iran were ordered blocked and frozen? Yes, Your Honor. That was the origination of it. There's been a plethora of additions and amendments since. Because I'm familiar with the Danes and Moore litigation, and there was a Boeing aircraft that was seized or attached, was subject to the Algerian Accords. That was a blocked asset at that time in 1981. That's correct. And you're saying that since that time, the United States has officially moved to block all assets of Iran? Yes, everything comes under that same general set of regulations. And what year was that? Was that 79? 79 or 80. And so that was before the transaction between MOD and cubic? No, no. It was after. The negotiations or the sale, the contract was done prior, but then the revolution took place. And I guess you have a ruling that cubic breached the contract. Ms. Almasi actually argued this down on the arbitration level. Well, we've sort of gotten off the subject a bit, at least as far as Mr. Fleta's counsel's argument. But just to complete it, since we're all on that topic, we'll let Ms. Almasi come forward. Yes, Your Honor, to answer Judge Wardlow's question, the contract between cubic and the former Iranian government was executed in 1978. And the OFAC regulations, which effectively froze the Iranian assets, obviously came into effect after the revolution. I believe it's 1981 is the correct date when they came into effect. They are cited in our pleadings. I understand that. But the question I think we all have is whether assets such as this judgment, which came into effect if that's the asset now, is that a judgment that MOD has? Is that currently a blocked asset? Your Honor, the term blocked assets referred to the assets that existed within the United States at the time the regulations went into effect. The regulations, however, specifically provide that from that time forward, essentially all transactions with the Iranian institutions or the Iranian government are to be regulated. Well, I understand they're regulated. Are they blocked? Is it your position that those are blocked assets, the assets that come into existence after 1981?  Your Honor, but they are certainly regulated and as a result require a license in order to be transported to Iran or delivered to Iran. In terms of this particular judgment, if the day comes where cubic is to deliver this money to the Iranian government, then at that time cubic must apply for a license. It's a regulated asset. Yes. That's why I asked Mr. Van Patten how he was defining blocked assets, because blocked assets is a term of art. It is, Your Honor. Well, he's told us that all the Iranian assets are blocked and you're saying no, they're not. No. The blocked assets, I believe, refer to those that existed in the United States at the time the regulations went into effect, the OFAC regulations. Other than that, beyond those assets, everything is simply regulated and you must acquire a license. And to respond to Mr. Perlis's earlier position, the reason there is no license is because no transfer has taken place or in the foreseeable future at any time when cubic is, in fact, going to deliver the money, then it is absolutely required to obtain a license from OFAC. And can OFAC say no and decide it will not license Iran to take the money out of the country? Your Honor, that is a question that I'm not prepared to respond to at this point. I mean, I'm not familiar with the requirements of OFAC, but I believe if once it has passed all the hurdles that has been placed in front of it, then I don't see any reason why OFAC would deny. In fact, there's a case on point where in Southern California recently, an Iranian banking institution sold a real estate property, and when the buyer was about to transfer the money to the banking institution, they applied for a license, and the license was granted. I was just thinking, supposing, as in this case, there were liens or garnishments or something on that money, would that factor into anything OFAC might do? For OFAC to get involved in proceedings, in judicial proceedings, is that the question? No, it's not. There's some kind of legal process in the United States, which a lien and a garnishment would be, that puts some kind of a hold on part of the funds. Perhaps you should just give me a cite to the regulations that require the licensing. I will do that in a moment, Your Honor. I will find it, and I will provide you with the cite. Thank you. A few years ago, Your Honor, we got a judgment in a similar situation, and we applied for a license, and it was granted without any problem. All right. All right. Mr. Perlis. Thank you, Your Honor. First, to clear up some of the questions that were just posed, this is not a blocked asset. Blocked asset is a word of art. These blocked assets are funds that are either impounded by the Treasury and held by the Treasury or funds that are held at private lending institutions under express instruction from the Treasury. Second is a question of law. All Iranian assets in the United States are not subject to regulation. Only the assets that fit within the description of the statutes outlined in Section 1610, that Your Honor referred to earlier, are regulated. I believe in their pleadings, Iran gave an example of a notice that Mr. Flato received from the Treasury, and you'll see it's very carefully worded. It says most Iranian assets in the United States. The government does not contend that all Iranian assets are. The question is whether this asset at this stage of this proceeding is regulated. The question is was it regulated at the time that the judgment lien was entered here, and by their own admission, it wasn't. They have said it becomes regulated after they win, and they decide to transfer funds. It's the movement of funds outside the United States, in which the government of the United States has a regulatory interest. When Iran comes here and engages in this proceeding, they're just like any other international party that's coming to the United States to enforce an arbitral award under the present convention. They are not regulated at the present time, and therefore the judgment lien is not subject to the relinquishment that Mr. Flato exercised in order to receive what is, in effect, a sophisticated block fund liquidation system that was put in place by Congress. Indeed, I think the intent of Congress is reflected in this mechanism. Congress would not have afforded parties like Mr. Flato the opportunity to either take 100% of their judgment or what is called the 10% bonus if that were a theoric distinction. If everything is regulated, then there would be no reason for any party to accept option B of that two-tiered system and take only the 100%. What would they be able to do? You're over your time, but I want to ask one question. Are you saying, then, that even though MOD has a judgment against Cubic and you have a lien on that judgment, neither of those assets is regulated at this point or subject to regulation? That is correct. What is subject to is transferred out of the United States. So if they never transfer it out of the United States, they just hold it and spend it in the United States, then it would never be subject to regulation? That's correct. All right. Thank you. Thank you, Your Honor. Okay. We'll move to Mr. Elahi's case. Ben Patton. You're going to have to speak up, please. We cannot hear a word over here. Ben Patton for the Ministry of Public Defense. Is anyone speaking? Yes. Yes, I believe I am, Your Honor. Can you hear counsel? We cannot hear counsel at all. Okay. Pull the mic way in real close. Is this better, Your Honor? Is anything coming through? No. Okay. It's not the fault with counsel, then. It's with the mic. It was fine before. Who is counsel? Which counsel is speaking now? Mr. Ben Patton is taking the lead for MOD in this case. We're trying to see if we can figure out what's going on. While you're doing that, I'm going to try to see if I can get the hearing online. And as long as you can hear me. I can hear you, Your Honor. Can you hear me now? There's a bad connection on the mic, apparently. Oh, maybe I turned it off. Okay.  Yeah. He put his notebook on. All right. Let's start over at ten minutes. The old trick in the book, and I got caught again. Okay. Let's start all over again. Okay. Go ahead. Tony Van Patten for the Ministry of Defense, Your Honor. I won't recapitulate the papers. We've set out most of our argument there better than I could do it here now. The one thing that did not come up in the paper in time for inclusion in the brief was the Sicipio case in the Second Circuit. And that was the Court of Appeals of the Second Circuit found that there was no federal law that authorizes finding a foreign sovereign liable for killing or injury by a terrorist act. Well, that may be true, Counsel. But the judgment, the default judgment was entered two years before this case, other case even, was heard of. I don't think we go back and apply possibly new law to a case that was not appealed. Your Honor, the Ministry of Defense was not before the court. The government of Iran was before the court at that time. You had that opportunity, though. Well, in the Baldwin traveling man's case, it's clear that a defendant has a right not to appear when there's no subject matter jurisdiction and attack the jurisdiction later on. And that's a good case. Well, that may be true, but who knows? The new case may not be right. The first case may be right. Maybe there was subject matter jurisdiction. That probably there was. Well, the Court of Appeals case was over both of the district court cases here. So at least so far as that district is concerned, or that circuit is concerned, it's the correct decision so far. It has not been appealed. Well, I understand. And it has always been the case, as far as I know, that subject matter jurisdiction can be raised either by the parties or by the courts themselves. And, in fact, the issue is so it's basically a matter of separation of powers because by the district court making a decision on the basis of a law that doesn't exist, they're arrogating, well, not arrogating perhaps, but taking on themselves the right of the legislature to make those laws. Well, when you raised this issue kind of peripherally to this court, you didn't really do it on the basis of subject matter jurisdiction as I read your papers. The Sicipio case, well, the Sicipio case had not been decided at that time.  At least it hadn't come out, Your Honor. But it is a subject matter jurisdiction issue. It may be, but if you didn't raise it to the district court here, it seems to me that you have a real problem. Well, Your Honor, I think that subject matter jurisdiction goes to the authority, the very power of a court. The court is taking the power of the legislature. It's not supposed just to make laws. Well, this is a collateral attack on a decision that was made by the district court in the District of Columbia. And at that time, the issue was raised and disposed of. Well, there was no apparent, it was a default judgment. I mean, the Covington case which we raised clearly says that you can raise that issue collaterally. Because if the court doesn't have the power to render the decision, it can be raised any time. Where there's a default judgment. Where there's a default judgment. All right. So the point is that there was no law, so there's not a change of law. The circuit court found that the district courts were acting improperly and not in accordance with the law. Therefore, there was no subject matter jurisdiction, and the judgment's void. Well, hypothetically, what if we were to examine it and decide there was subject matter jurisdiction and we disagreed with the Court of Appeals of the District of Columbia? Well, we would have no choice but to declare a difference of opinion among the circuits and take it up, Your Honor. I mean, I think that's what you would expect. So the question may have been rhetorical then. I'm sorry. Okay. The only other issue, unless Judge Fischer, did you have some questions on the CBO case? No, go ahead. The district court raised the question of whether the government of Iran is a person or not under the Constitution for purposes of equal protection, due process purposes. And he analogized, as some other cases have, foreign states to domestic states of the United States and said then that due process was not available to it. But I think that was an incorrect analogy. The correct analogy is to Indian tribes, I believe, and that's the position of the Ninth Circuit, or at least of the district court in the Ninth Circuit. And the Sixth Circuit discussed the problem as follows. To the extent that Indian tribes are discussed in the Constitution, they seem to be recognized as having a status outside its parameters. Indian tribes are treated as entities with whom to have commerce and to make treaties. And that's precisely the way foreign sovereigns should be treated. And I think it's fairly universal to accord Indian tribes the constitutional protections of due process and equal protection. I have a question relating to Section 1610b-2, which the Allahi litigants argue waives sovereign immunity or permits attachment. Are you familiar with that argument? That we waive detachment? No, the statute itself does it. In terms of attachment, assuming we ever get to this level of analysis, let me just ask it this way. Would you say that MOD is engaged in commercial activity in the United States? No, it is not. Well, when it told Cubic to sell its device to somebody else, isn't that a commercial transaction? It didn't tell it to your hiring. Cubic did it on its own without informing. Weren't they supposed to then transmit the assets to MOD? They were authorized to sell, weren't they? Not by the MOD. Counsel must have turned off the mic again. Hold on a second. We have a supplemental argument here by Ms. Almasy. Okay, go ahead. Your Honor, this is Mina Almasy on behalf of MOD. There were some negotiations, but they never came into anything final. And then Cubic took it upon itself to simply sell the asset to the Canadian government and pocketed the proceeds. And for many, many years, the Iranian government had no idea that that had, in fact, taken place. What was the nature of the negotiations? Was it negotiating to transact a commercial transaction? Which negotiations, Your Honor, are you referring to? Negotiations with Cubic as to what to do with the device. That's precisely what happened at the time of the revolution. Essentially, the asset was ready to be delivered. However, Iran could not take delivery because of the lack of communication between the governments that happened after the revolution. Is your question? I'm not sure I understand your question. What was the nature? You said negotiations went on. Yes, they did. What was the nature of the negotiations? What were they negotiating about? What to do with the money. Iran wanted its money back. Iran could not take delivery under the regulations from the U.S. government because Iran was not allowed, could not obtain a license to export. Well, the problem arose when Cubic could not obtain a license to export the asset to Iran. Okay. And it was clear that that would not be happening for many, for a period of time. Iran, therefore, wanted its money back. So did they indicate that if the asset were sold, that would be okay and then they could get their money? That was Cubic's position. Cubic suggested – Well, what about MOD's position? MOD wanted the return of the funds because it could not take delivery as a result of the U.S. regulations. It had nothing to do with what the Iranian government had put in place. The Iranian government did not restrict delivery. The U.S. government restricted delivery. Therefore, there was nothing for Iran to do. I understand all that. The question is really whether there was negotiation as to whether Cubic could sell it and then deliver the funds. There were, yes. There were some negotiations. But as I said, it never came to anything final. Okay. All right. You used your time. We'll hear from Mr. Elahi's counsel. Yes, my name is Jonathan Mook. I'm here today on behalf of Darius Elahi, who is here to basically seek vindication for his brother Cyrus, who was an American national who was assassinated by agents of Iran because Cyrus was advocating a free and democratic Iran. And Dr. Elahi, Darius Elahi, who we represent, has been pursuing this case and is seeking to collect on his judgment and to obtain compensation for Iran, not only to vindicate the memory and the rights of his brother, but also I think for purposes of this country's pursuit and its war on terrorism. Well, counsel, you're going to use that for ten minutes. We understand the case and are sympathetic to the human concerns here, but we've got a very complicated statutory structure that Congress has left us with. So you better take your time navigating through that. Let me address those points now. I'd like you first to comment on whether this recent opinion of the District of Columbia Court of Appeals has any bearing on this case. Your Honor, if it has any bearing, I think it should affirm or confirm to this Court that there is subject matter jurisdiction under the statutes upon which sovereign immunity has been waived or has been eliminated in the case of terrorist states. In the case in Sicipio opinion by the District of Columbia Circuit Court of Appeals, the Court specifically found that there was subject matter jurisdiction and that, and I quote from the Court's opinion, we affirm the judgment of the District Court, Section 1605A7 of the FSIA, abrogates foreign sovereign immunity and provides jurisdiction in specified circumstances. That is, the circumstances set forth in Section 1605A7 of the Foreign Sovereign Immunities Act, the statute under which Mr. Elahi brought his suit against Iran. Now, to be sure, in Sicipio, the D.C. Circuit went on to find that the statutory provision, the federal statutory provision, although it waived sovereign immunity and abrogated foreign sovereign immunity, creating subject matter jurisdiction in the District Courts, the D.C. Circuit found that the statute did not create a federal cause of action. But I think it is significant in the Sicipio case that the D.C. Circuit did not vacate the judgment of the District Court. It remanded the case for further consideration as to whether or not the Sicipios might have another basis for asserting a cause of action in pursuit of their claims against Iran. So I don't think, I think if anything, the Sicipio opinion confirms that there is, there was subject matter jurisdiction in the District Court for the District of Columbia and that the Section 1605A7 of the Foreign Sovereign Immunities Act validly waived sovereign immunity so that the Sicipios and Mr. Elahi could pursue his claims against Iran. So I think there's no problem about subject matter jurisdiction, Your Honor. And in addition, as I said in the Sicipio case, it left open as to whether or not there may be causes of action against Iran. So I think it's best characterized, as we have in pleadings we have filed in this court, that it is a change in the law, some new law by the D.C. Circuit, which should not apply to a final and unappealed judgment by Iran. I think it should be very clear here that Iran certainly was accorded all its due process rights, even if it is assumed that Iran is a person for purposes of constitutional analysis. It certainly had notice of Mr. Elahi's case. It had the opportunity to come in and defend, both in terms of opposing a default judgment and in terms of the hearing upon which liability and damages were found. So I think there should be no question at all that Mr. Elahi's final and unappealed judgment is one that he can seek to enforce in the courts of the United States, and that is precisely what he is doing. With respect to the bases for the lien that Mr. Elahi has filed with the district court on the judgment that Iran has or Mott has against Kubick, I think there certainly are a number of bases upon which this court could find that that lien is valid under the various exceptions to sovereign immunity in the Foreign Sovereign Immunities Act. What I'd like to specifically address is the exception that was raised in our brief that occurs with the passage of the Terrorism Risk Insurance Act. That act was passed by Congress on November 26, 2002. Well, you heard his counsel trying to find out what a blocked asset is. Yes. And that's the heart of your problem, I believe. Well, under the Terrorism Risk Insurance Act, as Your Honor knows, that does allow claimants with judgments against Iran, including Mr. Elahi, to attach blocked assets of a foreign state. But is this a blocked asset? Right. And I think until today in Ms. Almasi's statement, I think apparently for Mott taking the position that it wasn't a blocked asset, it certainly appeared from the briefs that, in fact, Iran has conceded or even stated it was a blocked asset as part of its argument that we couldn't attach the asset by virtue of the regulations. Now, the term blocked asset is defined in Section 201 of the TRIA as constituting and that's under Section 201A-D-2. It defines the term blocked asset as any asset seized or frozen by the United States under the Trading with the Enemy Act, but also under Sections 202 and 203 of the International Emergency Economic Powers Act, which is 50 U.S.C. Sections 1701 and 1702. Now, we would contend that the judgment that Iran has against Cubic would constitute a blocked asset because it is an asset that is frozen under Section, specifically under Section 203 of the IEEPA. That section gives the President authority to investigate, regulate, or prohibit any transactions or transfers of assets of countries for whom the United States has blocked or frozen assets. And I think it's clear under the regulations implementing Section 203 of the IEEPA that a judgment against Iran is property that is subject to regulation by the U.S. government, that in essence it is frozen because a party cannot engage in any transaction with respect to that asset except pursuant to regulation. So as a consequence, Your Honor, I believe that going through the statutory language and the statutory definition in the TRIA that Iran's judgment against Cubic would come within the term blocked asset and therefore be subject to attachment under the TRIA. If that is not the case, as I said, we have raised other arguments and other provisions of the Foreign Sovereign Immunities Act, which would allow us to attach the judgment that Iran has. And I think most particularly the fact that this would be an asset whose purpose was commercial in nature, that Iran here in this case was seeking to confirm a commercial arbitration award arising from a commercial transaction, and therefore it would come within the commercial exception either under 1610A-7 or under 1610B-7 of the Foreign Sovereign Immunities Act. And then finally, Your Honor, I believe that none, and we have set forth in our brief, if we have the requisite statutory authority to attach this asset, that asset comes within none of the exceptions under 1611 of the Foreign Sovereign Immunities Act, that being a property of the central bank or military property. Potentially in the past it may have been the origins were military in nature but no longer. I think our reasoning and our briefs are fully set forth, and I will not burden the Court with any further argument on that score. All right, thank you. Thank counsel very much. Time has expired on both sides. We can't hear you from down there. Approach the lectern, please. Don't talk until nobody can hear you. We all can't hear you, let's put it that way. Your Honor, I was stopped in my discussion of the Sicipio case. We got sidetracked, and I'd like to respond to one point. We'll make it quick because you have used your time. The counsel said that because the Court of Appeals determined that there was subject matter jurisdiction so far as the jurisdiction over the state was concerned, that that was the end of it. But if that were the case, there would be a 1331 federal cause jurisdiction over all cases where the defendant was not a sovereign immunity. So under the FDIC Myers and Flamingo cases that were out of this district, it's clear there's a two-step analysis. First, sovereign immunity. Yes, we're familiar with that. Thank you. All right, thank you. Thank you, counsel. The case just argued is submitted. We will stand in adjournment.
judges: B. Fletcher, Wardlaw, Fisher